1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  JAMES C. BRACKETT,                    No. CIV S-09-1233-CMK

12              Plaintiff,

13       vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                Defendant.
16
    _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 24) and defendant's cross-

23  motion for summary judgment (Doc. 25).

24  / / /

25  / / /

26  / / /

                                        1

## I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on September 22, 2005.  In the application, plaintiff claims that disability began on April 1, 2003.  Plaintiff claims that disability is caused by a combination of: ". . . multilevel degenerative disk disease with obliteration of the neural foranima at L5-S1, diffuse idiopathic skeletal hyperostosis (DISH), diabetes, hypertension, and depression."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 13, 2007, before Administrative Law Judge ("ALJ") L. Kalei Fong.   Following the December 2007 hearing, plaintiff was referred for a consultative orthopedic examination, which took place in January 2008.  A second hearing was held on May 7, 2008, at which time an impartial medical expert testified.  In a October 15, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; diabetes; and hypertension;

2. The claimant does not have an impairment or combination of impairments that meet or medically equal an impairment set forth in the regulations;

3. The claimant has the residual functional capacity to perform the full range of medium work; he is limited to only occasional climbing of ladders, ropes, and scaffolds, and he can occasionally crawl; stooping, kneeling, and crouching are limited to occasional;

4. The claimant is unable to perform any past relevant work; and

5. Considering the claimant's age, education, work experience, and residual functional capacity, and based on application of the Medical-Vocational Guidelines set forth in the regulations, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on May 5, 2009, this appeal followed.

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

August 3, 2006 – Dr. Mulligan, plaintiff's treating physician, signed a "Verification of Physical or Mental Incapacity" indicating that plaintiff was unable to work for three months due to chronic low back pain.  The doctor does not reference any objective findings.

August 20, 2006 – Plaintiff submitted a "Function Report – Adult" in connection with his applications.  Plaintiff stated that, on a day-to-day basis, his activities consist of:  "Eat, shower, watch TV, read news paper, eat dinner, watch TV."  He prepares his own meals consisting mainly of TV dinners.  He stated that he does not care for any people or animals.   He stated that it is hard to put on his shoes and socks due to pain.  As to household chores, he stated that he only does laundry once a week and that he does not need help with this task.  He stated that he cannot do yard work or other house work due to pain.  He stated that he goes out of the house four or five times a week, but can only drive short distances due to back pain.  He does his own grocery shopping once or twice a week for about one-half hour at a time.  He added that he requires the use of a walker, wheelchair, or cane when shopping.  He stated that he can handle funds, count change, and use savings and checking accounts, though he stated that he cannot pay his bills due to lack of money.  He stated that, due to pain, he is unable to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, or use his hands.  He stated that he can only walk 150-200 feet and then must stop and rest for five or ten minutes.  He stated that he usually finishes what he starts and can follow both written and spoken instructions.  He stated that he gets along with authority figures "very good."  He added that he does not handle stress well, but can do "ok" with changes in routine.

August 28, 2006 – Plaintiff's mother, Geraldine Brackett, submitted a "Function Report – Adult – Third Party."  Her statements as to plaintiff's capabilities are essentially the same as the description provided by plaintiff in his August 20, 2006, function report.

December 7, 2006 – Janet O'Brien reported on a complete internal medicine evaluation. Plaintiff's chief complaints were low back pain, hip pain, hypertension, and diabetes. Regarding low back pain, the doctor outlined the following history:

> This has troubled him for years; he dates it back to a motorcycle accident when he landed with his back across a curb. He was seen in a hospital for a bruised kidney after the accident. In 1993 he was lifting weights and developed a sciatic pain and was told "I had a vertebra pushed forward." He was given an epidural steroid injection without improvement. Currently he complains of "lots of pain" in the lumbosacral spine. It will wax and wane but it is present constantly. He notes "it hurts a little bit all the time, but sometimes it can be pretty unbearable." The severity varies between 4-8/10 in intensity. It is worse "depending on how much I walk, but better with rest."

As to hip problems, the doctor reported:

> He notes that the hips and knees hurt "just pretty much all the time." It is difficult for him to describe the quality. He relates that "sometimes it feels like I am cut in half here" and he indicates the waist. He notes that he might had to walk for a second when it starts to lock up. He complains of an aching pain of varying intensity.

On physical examination, Dr. O'Brien observed that plaintiff demonstrated ". . . some guarding with walking and changing positions." The doctor noted a slight limp favoring the right and that plaintiff expressed pain when reaching down for his socks. However, the doctor also observed:

> He demonstrates no difficulty walking down the hall to the examination room, no difficulty sitting during the history, and no difficulty getting onto the examination table. He demonstrated no difficulty removing his socks and shoes.

On examination of plaintiff's back, Dr. O'Brien noted: "Normal lumbar lordosis and thoracic kyphosis.. No evidence of scoliosis." The doctor observed no difficulty with squatting and rising. Decreased ranges of motion were noted on cervical flexion and rotation as well as dorsolumbar flexion. Decreased ranges of motion were also noted on elbow flexion, hip forward flexion, and knee flexion. Straight -leg raising was negative for low back pain bilaterally both in the seated and supine positions. Strength was intact. Dr. O'Brien diagnosed low back pain without evidence of radiculopathy, as well as hip and knee pain consistent with degenerative

joint disease.  The doctor outlined the following functional assessment:

> The claimant should be able to stand and walk 6 hours in an 8-hour workday.
>
> The claimant should be able to ambulate as needed for banking, shopping, and traveling to and from work or school.  He should be able to walk a block over rough or uneven surfaces.  He should be able to use public transportation.  He should be able to climb a few steps with the use of a handrail.
>
> The claimant should be able to sit 6 hours in an 8-hour workday.
>
> Assistive device: none.
>
> The claimant should be able to lift and carry 25 pounds frequently and 50 pounds occasionally, limited by age.
>
> Postural limitations: the claimant should be able to stoop, crouch, kneel, and climb 6 hours in an 8-hour workday.

Dr. O'Brien did not note any other limitations.

January 10, 2007 – Dr. Mulligan signed another "Verification of Physical or Mental Incapacity" form indicating that plaintiff could not work for three months due to low back pain and "prognosis uncertain."  Again, no clinical findings are noted to support the doctor's conclusion that plaintiff's low back pain is disabling.

January 17, 2007 – Agency consultative doctor P. Suster, M.D., submitted a physical residual functional capacity assessment.  The doctor opined that plaintiff can occasionally lift/carry up to 50 pounds and frequently lift/carry up to 25 pounds.  Plaintiff could sit/stand/walk for about six hours in an eight-hour workday.  Plaintiff's ability to push/pull is unlimited.  Plaintiff could frequently balance but only occasionally climb, stoop, kneel, crouch, or crawl.  No manipulative, visual, communicative, or environmental limitations were noted.  Dr. Suster noted that the treating records do not contain findings which would support a significantly different assessment.

/ / /

/ / /

      April 6, 2007, October 22, 2007, and January 10, 2008 – The record contains three more "Verification of Physical or Mental Incapacity" forms completed by Dr. Mulligan indicating that plaintiff cannot work.  No objective findings are noted.

      June 21, 2007 – Dr. Mulligan prepared a progress note on follow-up to plaintiff's complaints of chronic low back pain.  The doctor noted that plaintiff had been advised to take baby aspirin once a day but had not been compliant with that instruction.  On physical examination, the doctor did not note any clinical findings relating to back pain.  Dr. Mulligan directed plaintiff to take the aspirin.

      January 25, 2008 – Agency examining doctor Jane Wang, M.D., reported on a comprehensive orthopedic evaluation performed at the request of the agency.  As to activities of daily living, the doctor reported:

> He drove to today's appointment.  He can fill gas in his car.  He can drive for about an hour or so, when his back becomes painful and he would need to stretch.  He lives in a one level house with his mother. . . .

Following a detailed physical examination, Dr. Wang offered the following diagnosis:

1.    Low back pain, since 1993.  X-rays of the lumbar spine shows DJD changes.  On today's examination there was decreased active range of movement in the dorsolumbar area associated with pain.  Straight leg raising tests were negative both in the sitting and supine positions.  There was no weakness noted in the lower extremities.  Knee examination was unremarkable.  There was decreased internal and external rotation of the right hip associated with pain.

2.    Depression: claimant appears depressed and was tearful at the end of the examination.  He is on medications for this and would benefit from evaluation.

3.    History of diabetes, hypertension and hypercholesterolemia: followed up every month by his physician.

The doctor offered the following functional assessment:

1.    Claimant is permitted to stand and walk six hours in an eight hour work day.

2.    Claimant is permitted to sit 6 hours in an eight hour work day.

3.    Claimant does not need any assistive devices for short, long distances and over uneven terrain.

4.    Claimant can be expected to lift and carry 50 pounds on an occasional basis and 20 pounds on a frequent basis.

5.   Claimant is permitted to bend, stoop, and crouch on an occasional basis with holding on to a stable surface with one hand.
6.   There are no manipulative limitations to reaching, handling, feeling, grasping, and fingering.
7.   There are no visual, communicative and environmental limitations.
8.   Claimant can continue to drive as tolerated.

May 7, 2008 – An independent medical expert – Dr. Michael Gervey – testified at the second administrative hearing.  After the ALJ confirmed that Dr. Gervey had reviewed the available medical record, the following exchange took place between the ALJ and the doctor:

Q:   Okay, good.  Then, Dr. Gervey, based on your review of the records, can you tell the Court what the Claimant's conditions are?

A:   Yes, Your Honor, there are two areas that I've identified, one of which is orthopedic, excuse me, neuromuscular in, in origin.  And that would be a history of chronic low back pain since 1993 with some evidence of degenerative disk disease and degenerative changes.  The second area is diabetes mellitus, type II, which apparently is controlled with medications.  And hypertension, which is controlled with medications.

* * *

Q:   Okay.  Would you be able to provide me a functional capacity based on your review of the record?

* * *

A:   Okay.  My opinion is that the functional capacity assessment would be that as far as lift and carry he would be in the moderate category of occasionally 50 pounds and frequently 25 pounds, he could sit, stand, and walk 6 out of 8 hours with the usual breaks.  There would be no restrictions with regard to push and pull.  Posturally, he could occasionally climb ladders scaffolds, and ropes.  He could occasionally crawl.  There would be no manipulative restrictions.  There would be no environmental restriction.  And there would be no audiovisual restriction.

There was then a discussion of MRI test results:

Q:   Okay.  And based on the findings, the multi-level degenerative disease, and this is the lumbar area, is there anything that you can explain to me with regards to when it says protrusion, L4, 5 –

A:   Yes.

Q:   – it says paracentral disk protrusion on the left side.

7

1        A:      Right.

2        Q:      Can you explain to me, when they say protrusion, would
that need further clarification in your mind?

3

4        A:      No, what that means is that the radiologist, on the reading
of the MRI, say that there was a protrusion without herniation of
intervertebral disk in certain areas of the central left portion of the, of the

5        disk.  It touched the ventral, or the front part of the fecal sac and it does
not measure the size of the protrusion.

6

7        Q:      So that would not raise any concerns with creating some
nerve, impression on the nerve?

8        A:      No, it would not.

9        Q:      Okay.  What about in L5, S1?  I know there's disk
degeneration which is not unusual as we age, but the osteophytic spurring,

10       can you tell me more about that?  What would that tell you?

11       A:      Well, I think that the osteophytic spurs here that they talk
about were probably on the front part of the vertebral body, meaning the

12       part of the, the vertebral body towards your belly.  And I don't think
they're of any significance.  They're the body's abortive attempt to deal

13       with stress and repair itself.

14       Q:      Okay.

15       A:      There are, however, osteophytes that were noted at the area
of the foramen which were noted at L5 and S1.  And all that is is there's

16       some degenerative osteophytes, or a little built up of bone or spurs, if you
want to call it that, near the area where the nerve root goes through the

17       foramen, the neuroforamen.  There is, however, no mention that the nerve
roots were compressed or compromised.

18

19       Q:      Okay.

20       A:      Now the other thing that was mentioned as long as we're
talking about this, is facet hypertrophy.  And this just means that when

21       they look at the facet joints, which are small articulated joints between the
vertebra, there were some changes consistent with some degenerative

22       arthritic changes.

23  /// 

24  /// 

25  /// 

26  /// 

8

1   The following exchange took place between the expert and plaintiff's attorney regarding the

2   various "Verification of Physical or Mental Incapacity" forms completed by Dr. Mulligan:

3           Q:      I'll represent to you that Dr. Mulligan is Mr. Brackett's
            primary treating physician at the county clinic.  And do you see on each of
4           those forms, they're dated from August of '05 through October of '07 that
            Dr. Mulligan indicates that Mr. Brackett is quote, unable to work, end
5           quote?

6           A:      Yes, that's what he thinks.  Some of these are done by a
            physician's assistant.
7
            Q:      Okay, and some by Dr. Mulligan?
8
            A:      Yes.
9
            Q:      Do you take anything from those documents in arriving at
10          your opinions regarding the residual functional capacity of Mr. Brackett?

11          A:      No, I did not because I accept what Dr. Mulligan says, but I
            don't know the reason for it.
12
            Q:      Okay.  I don't have any other questions.
13
            A:      I mean, I just can't comment anymore than that because it's
14          just a statement that he makes and there's no objective physical findings,
            but there is a history of back pain, etcetera.
15

16          May 20, 2008 – Plaintiff was evaluated by Dr. Kenten Wang of U.C. Davis

17  Medical Center.  Dr. Wang reported the following history:

18          This is a 52-year-old male who complaints of low back pain since 1994
            gradually worsening over time.  He started lifting weights and working out
19          initially in 1994.  It gradually got worse.  He denies any specific incidents
            of low back pain.  The pain is mainly in the lower back and leg.  He
20          describes it as sharp, numbness, electric-like pressure, cramping and dull
            aching, occurs all the time.  Activities that can increase his pain include
21          standing, walking, exercising, lifting, bending.  Activities that will
            decrease his pain including lying down, resting, sitting.  Activities that do
22          not change his pain include coughing, sneezing, and bowel movements.
            Functional limitations include going to work, household chores, yard
23          work, shopping, socializing with friends, recreation, and exercise.

24          Previous treatments have included only medications daily, which provide
            moderate relief.  He has not been through physical therapy.  Previous
25          diagnostic studies have included MRIs and x-rays.

26  / / /

The doctor also noted that plaintiff complained of "depression due to the 'system.'" The doctor also noted: "He denies having any equipment needs" and that plaintiff ". . . is independent with basic activities of daily living." Following an objective physical examination, the doctor reported the following impression:

> This 52-year-old male who complains of chronic low back pain since 1994 when he started weight lifting but gradually worsening over time. The pain has limited his activities as well as his work. Physical exam did not show any neuropathic findings. Physical exam is most consistent with joint/tendon pain especially along the sacroiliac joints and hip joints. This is due to very tight muscles as there was very minimal range of motion of the lumbars and the hip joints. His hamstring popliteal angle is 80 degrees. It is unclear of the reason for his muscular tightness and may be idiopathic such as in DISH. There are some hereditary disorders that can lead to tight muscles.

The doctor added the following addendum regarding imaging studies:

> Reading of x-ray pelvis/hips from 5/20/08: there is evidence for Coxa Profunda bilaterally with marked new bone formation along the femoral head/neck junction and osteophyte formation. This is a variation of femoral acetabular impingement with secondary osteoarthritis.
>
> Result of x-ray lumbar: extensive degenerative disk disease is noted involving entire lumbar spine. The changes include degenerative disk disease and degenerative changes of the vertebral bodies with formation of prominent anterior osteophytes. SI joints were normal.

> <u>July 2, 2008</u> – Plaintiff was evaluated again by Dr. Wang. In his report, Dr. Wang

outlined the following history:

> This is a 53-year-old male who complains of low-back pain since 1994., gradually worsening over time. He started lifting weights and working out initially in 1994. This is when his back pain started. He was last seen in the Spine Clinic on 05/20/08. At that time, the physical exam was most consistent with tight muscles with very limited range of motion in the lumbars and hip joints. His popliteal angle is about 80 degrees. It was unclear of the reason for his tightness and decreased range of motion. I thought it may be idiopathic such as in DISH.

/ / /

/ / /

/ / /

The doctor also reported that plaintiff last worked in January 2005 stocking items at Target.  Dr. Wang reported the following objective findings on physical examination:

> On physical exam, weight is 209 pounds which is down 7 pounds since the last clinic visit, height is 5 feet 11 inches, blood pressure is 120/90, temperature is 97.8, pulse of 58, respiration 18.  Pain is rated at 6 out of 10 in the lower back and 3 out of 10 in the legs.  GENERAL: This is a well-developed, well-nourished male in no acute distress, who is alert and oriented on examination.  His affect appears friendly.  His breathing is non-labored.  Gait is non-atalgic; however, he is very stiff.  He has forward truncal lean.  He also has an increased thoracic kyphosis.  His coordination otherwise is normal.  Reflexes are intact on previous examination.  No focal weakness is noted in the past exam.  No significant edema is noted in the lower limbs on cardiovascular exam.  Skin examination does not show any rashes.  Musculoskeletal exam does not show any focal atrophies of the lower limbs.  Range or motion in the lumbar spine is poor in all directions with very minimal extension and sidebending.  He is able to reach his fingertips to his knees.  His hips are also very limited on range of motion.  He has some discomfort with internal rotation of the hips.  Hip flexion is only able to be achieved to about 90 degrees.  He also has positive Ely test with hip hike indicating quadriceps tightness.  He also has tight hamstrings and popliteal angle of about 80 degrees.

Regarding available MRI and x-ray studies, the doctor stated:

> MRI of the lumbar spine was reviewed on previous exam.  It was dated 04/07/08.  It showed multilevel degenerative disk disease, especially in the lower lumbar spine.  There is some anterior osteophytic spurring suggestive of a DISH.
>
> X-rays of the lumbar spine dated 05/20/08 was reviewed with the patient today.  It showed diffuse degenerative disease of the lumbar spine with prominent anterior osteophytes and obliteration of the neural foramina at L5-S1.  There is extensive degenerative disk disease in the entire lumbar spine.  X-rays of the hips dated 05/20/08 also showed femoral acetabular impingement with marked osteoarthritic changes.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### IV.  DISCUSSION

In his motion for summary judgment, plaintiff argues: (1) the ALJ improperly rejected the opinions of his treating physician, Dr. Mulligan; (2) the ALJ improperly rejected his testimony as not credible; (3) the ALJ improperly rejected third-party lay witness statements; and (4) the ALJ improperly applied the Medical-Vocational Guidelines despite the existence of non-exertional limitations.

## A.   <u>Evaluation of Medical Opinions</u>

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See <u>Lester v. Chater</u>, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See <u>id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996); <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See <u>Lester</u>, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See <u>Lester</u>, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See <u>Lester</u>, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See <u>id.</u> at 831.  In any event, the Commissioner need not give weight to any

1    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3    see also Magallanes, 881 F.2d at 751.

4           Plaintiff argues that the ALJ failed to articulate sufficient reasons for rejecting the

5    opinion of his treating physician, Dr. Mulligan.  As to this doctor, the ALJ stated: ". . . [T]he

6    treating records submitted do not support an opinion of an inability to work because they do not

7    show objective medical findings consistent with the claimant's reports of significant limitations

8    in the ability to perform daily activities due to pain."  The ALJ added:

9           In making the determination that the claimant remains capable of
            performing medium work, the undersigned also agrees that there are no
10          medical findings in the record to support treating physician, Dr.
            Mulligan's statements . . . that the claimant is unable to work.  First, the
11          determination of whether an individual is able to work is reserved to the
            Commissioner.  Additionally, the treating and examining records do not
12          document medical findings which would support an inability to perform
            all work.  The undersigned notes that in a June 21, 2007, progress notes by
13          Dr. Mulligan, no significant physical abnormalities were noted and the
            claimant was only advised to increase his exercise and work on a diet.  He
14          was also told to begin taking baby aspirin on a daily basis.  (Exhibit 68F).
            It appears to the undersigned that if the claimant's pain was as severe as he
15          alleges and/or the claimant was as limited as opined by Dr. Mulligan, this
            physician would have prescribed additional treatment for pain and/or
16          would have prescribed physical therapy or other treatment other than just
            pain medications.  The undersigned also notes that it appears that the
17          claimant was able to work in the past despite back pain based upon his
            early reports in the record that he had experienced back pain since 1993
18          but had been taking Vicodin to help control pain.  The medical records do
            not show any worsening in the claimant's back impairment since he first
19          sought treatment in 1993.  Thus, it appears that with pain medications, the
            claimant's pain may actually be better controlled then he reports.

20                                    * * *

21
            In the instant case, Dr. Mulligan has failed to provide medical findings to
22          support his assessments and the remaining medical records also do not
            support a determination of an inability to work.  Thus, the multiple
23          physical or mental incapacity forms submitted by Dr. Mulligan . . . are
            rejected.
24

25   Based on the foregoing, it is clear that the ALJ rejected Dr. Mulligan's assessments because they

26   were not supported by any objective clinical findings.  The court finds that this reason is legally

1  sufficient.  See Meanel, 172 F.3d at 1113.

2        The question is whether in fact Dr. Mulligan's opinion is unsupported as the ALJ

3  stated.  The court agrees with the ALJ.  In August 2006, January 2007, April 2007, October

4  2007, and January 2008, Dr. Mulligan completed forms entitled "Verification of Physical or

5  Mental Incapacity" indicating his opinion that plaintiff was unable to work due to chronic low

6  back pain.  No objective findings were referenced in any of these forms.  In June 2007, Dr.

7  Mulligan prepared a follow-up note.  On physical examination, the doctor did not note any

8  objective findings relating to plaintiff's back.  Plaintiff has not pointed to any portions of the

9  record in which Dr. Mulligan sets forth any objective findings.  Indeed, plaintiff's own summary

10  of records relating to Dr. Mulligan does not include reference to any objective findings.  The lack

11  of objective findings supporting Dr. Mulligan's opinions was a legally sufficient reason

12  supported by the record to reject the doctor's opinions.

13        **B.      Plaintiff's Credibility**

14        The Commissioner determines whether a disability applicant is credible, and the

15  court defers to the Commissioner's discretion if the Commissioner used the proper process and

16  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

17  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

18  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

19  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

20  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

21  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

22  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

23  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

24  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

25  / / /

26  / / /

15

1    If there is objective medical evidence of an underlying impairment, the

2  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5        The claimant need not produce objective medical evidence of the
        [symptom] itself, or the severity thereof.  Nor must the claimant produce
6        objective medical evidence of the causal relationship between the
        medically determinable impairment and the symptom.  By requiring that
7        the medical impairment "could reasonably be expected to produce" pain or
        another symptom, the Cotton test requires only that the causal relationship
8        be a reasonable inference, not a medically proven phenomenon.

9     80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
    Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

10

11    The Commissioner may, however, consider the nature of the symptoms alleged,

12  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13  947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

14  claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

15  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

16  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

17  (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

19  claimant cooperated during physical examinations or provided conflicting statements concerning

20  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

21  claimant testifies as to symptoms greater than would normally be produced by a given

22  impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

23  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24  / / /

25  / / /

26  / / /

1    After outlining plaintiff's various statements, including his hearing testimony, the

2    ALJ stated as follows with respect to plaintiff's credibility:

3        Clearly, if the undersigned were to find the testimony of the claimant . . .
         to be credible, a finding of disability would be directed.  However, the
4        claimant's subjective complaints . . . do not provide a basis to find
         "disability," and the undersigned finds that the objective medical evidence,
5        including the testimony from the medical expert, does not support the
         degree of fatigue, pain, side effects from medications, and other
6        limitations as alleged by the claimant. . . .

7    The ALJ then outlined the various portions of the record indicating inconsistency between

8    plaintiff's testimony and the objective evidence.  The ALJ then stated:

9        Although the claimant's impairments could reasonably be expected to
         produce some limitations, the claimant's testimony . . . suggests greater
10       limitations than can be shown by the objective medical evidence.

11   The ALJ also noted a very conservative course of treatment, consisting of, at most, medications

12   which plaintiff did not take at times.  Plaintiff argues that the adverse credibility finding is:

13   (1)  undermined by Dr. Mulligan's opinions; (2) inconsistent with the conclusions of other

14   examining and non-examining doctors; (3) and was based on mischaracterization of Dr. Kenten

15   Wang's opinion.

16       Here, while the ALJ concluded that plaintiff's impairments could be expected to

17   cause pain and other symptoms, the ALJ found that the objective evidence does not support

18   plaintiff's testimony as to the severity of such symptoms.  In support of this conclusion, the ALJ

19   cited the following facts: (1) none of the treating records from Dr. Mulligan contain objective

20   findings; (2) the examining and non-examining doctors all opined that, based on the objective

21   evidence, plaintiff can perform light or medium work; (3) plaintiff's pain was alleviated with

22   medication; and (4) plaintiff was able to work in the past despite similar complaints of back pain.

23   The ALJ also noted plaintiff's generally conservative course of treatment as a factor undermining

24   plaintiff's statements of totally disabling symptoms.

25   / / /

26   / / /

17

1          The court finds these reasons to be supported by substantial evidence.  As

2    discussed above, Dr. Mulligan's opinions are not accompanied by any objective findings.

3    Furthermore, as the ALJ noted, Dr. Mulligan's course of treatment consisted of prescribing

4    medication which, at times, plaintiff did not take.  Also as noted by the ALJ, the examining and

5    non-examining doctors all opined that plaintiff could perform light to medium work.  In

6    December 2006, Dr. O'Brien opined that plaintiff could stand/walk/sit for six hours in an eight-

7    hour day, plaintiff could lift/carry 25 pounds frequently and 50 pounds occasionally, plaintiff

8    required no assistive devices.  These findings are consistent with medium work.  Similarly,

9    agency consultative doctor P. Suster opined in January 2007 that plaintiff could perform the

10   physical demands of medium work.

11          Regarding Dr. Kenten Wang, plaintiff argues that the ALJ mischaracterized the

12   doctor's findings.  The court does not agree.  As to Dr. Kenten Wang, the ALJ stated:

13          The claimant also submitted new records from the Spine Program at U.C.
           Davis Health Center showing that the claimant was evaluated in May and
14          July of 2008 [by Dr. Kenten Wang] (Exhibit 109F).  Review of these
           reports show that on physical exam there were no neuropathic findings.
15          Physical exam showed tightness and limited range of motion suggesting
           degenerative changes.  The doctor noted that imaging had shown
16          significant degenerative changes and there was evidence of some anterior
           osteophytes. . . .

17

18   This summary is completely consistent with Dr. Wang's two reports.  In any event, Dr. Wang did

19   not offer any opinions as to plaintiff's functional capacity.  Therefore, Dr. Wang's reports from

20   2008 do not undermine the ALJ's credibility finding.

21          Other inconsistencies undermine plaintiff's credibility.  For example, plaintiff told

22   Dr. Kenten Wang in May 2008 that there were no "specific incidents" of back pain.  However, he

23   told Dr. O'Brien in December 2006 that he thought his back pain was caused by a motorcycle

24   accident where he landed with his back across a curb.  In August 2006 plaintiff and his mother

25   both reported that plaintiff could only drive "short distances" due to back pain.  However, in

26   January 2008 plaintiff told Dr. Jane Wang that he could drive for about an hour at a time.  In

1    August 2006 plaintiff and his mother both reported that plaintiff required the use of an assistive

2    device when shopping.  However, in May 2008 plaintiff told Dr. Kenten Wang that he did not

3    have any "equipment needs."  In his applications for benefits, plaintiff stated that he became

4    unable to work due to his impairments as of April 1, 2003.  However, he reported to several

5    doctors that he last worked in January or February 2005 stocking items at Target.[1]

6         **C.     Third-Party Lay Witness Evidence**

7              In determining whether a claimant is disabled, an ALJ generally must consider lay

8    witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

9    919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

10   testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

11   evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

12   F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

13   of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

14   919.

15             Regarding lay witness evidence from plaintiff's mother, Mrs. Brackett, the ALJ

16   rejected her statements as to plaintiff's limitations for the same reasons plaintiff's statements

17   were rejected as not credible.  Plaintiff argues that "[i]n so doing, the ALJ failed to provide

18   specific and 'germane' reasons for specifically rejecting Mrs. Brackett's third party statements

19   and observations as required by law."  The court does not agree.  As discussed above, the ALJ

20   cited proper reasons supported by the record for rejecting plaintiff's statements.  These same

21   _____

22   [1]       He reported to Dr. O'Brien that the Target job ended in February 2005, not
     January.  It is interesting to note that plaintiff did not list the job at Target in his applications.  In
23   his applications, plaintiff listed his last job as a "tool and die maker" and stated that he stopped
     performing this job in January 2002.  However, plaintiff reported elsewhere in his application
24   materials that he became unable to work in April 2003 and he reported to various doctors that he
     could no longer perform the tool-and-die job due to pain.  It thus appears that, contrary to
25   plaintiff's statements that he stopped working the tool-and-die job due to disabling pain, he
     actually stopped working that job for some other reason.  Had plaintiff actually been unable to
26   perform the tool-and-die job due to disabling pain, he would have listed his disability onset date
     as January 2002 when he stopped that job instead of April 2003 as set forth in his applications.

1  reasons are also germane to lay witness evidence provided by plaintiff's mother.  The court is

2  unaware of any case law, and plaintiff does not cite any, which holds that a "germane" reason is

3  one which is unique to a particular witness.  Because the reasons cited for rejecting plaintiff's

4  credibility also provided a basis to reject Mrs. Bracket's statements, they are germane to her as

5  well.

6          **D.      Application of the Medical-Vocational Guidelines**

7                  The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

8  disability for various combinations of age, education, previous work experience, and residual

9  functional capacity.  The Grids allow the Commissioner to streamline the administrative process

10  and encourage uniform treatment of claims based on the number of jobs in the national economy

11  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

12  460-62 (1983) (discussing creation and purpose of the Grids).

13                  The Commissioner may apply the Grids in lieu of taking the testimony of a

14  vocational expert only when the Grids accurately and completely describe the claimant's abilities

15  and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

16  Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

17  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

18  exertional strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

19  "If a claimant has an impairment that limits his or her ability to work without directly affecting

20  his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

21  by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

22  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

23  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

24  limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

25  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

26  / / /

1    In cases where the Grids are not fully applicable, the ALJ may meet his burden

2    under step five of the sequential analysis by propounding to a vocational expert hypothetical

3    questions based on medical assumptions, supported by substantial evidence, that reflect all the

4    plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

5    where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

6    ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

7    1341 (9th Cir. 1988).

8    Rather than obtaining vocational expert testimony, the ALJ applied the Grids as

9    follows: "Based on a residual functional capacity for the full range of medium work, considering

10   the claimant's age, education, and work experience, a findings of 'not disabled' is directed by

11   Medical-Vocational Rule 203.22 and 203-23."  Citing Bruton v. Massanari, 268 F.3d 824 (9th

12   Cir. 2001). plaintiff argues that use of the Grids was error because he has significant non-

13   exertional limitations and that the ALJ was required to obtain vocational expert testimony where

14   the evidence even suggested the possibility of a non-exertional limitation.  The court does not

15   agree that there was error in application of the Grids.  As discussed above, the record supports

16   the ALJ's finding that plaintiff is capable of medium work and that no significant non-exertional

17   limitations exist.  While plaintiff contends that non-exertional limitations, such as "tingling and

18   numbness in his lower extremities, fatigue, sit/stand/walk limitations, postural limitations,

19   lift/carry limitations, and the need to lie down for extended periods of time," no such limitations

20   are established by the objective evidence of record.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.     Plaintiff's motion for summary judgment (Doc. 24) is denied;

      2.     Defendant's cross-motion for summary judgment (Doc. 25) is granted; and

      3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 27, 2010

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE